Good morning, Your Honors. My name is Gerald Roberts, and I represent the petitioner in this case, Herminio Acevedo-Perez. For this morning's presentation, I'd like to concentrate on one simple issue, whether or not Mr. Acevedo had suffered past persecution. In the Board's decision, the petitioner had only unfulfilled threats, which alone did not constitute past persecution. The problem I have a bit with the Board's decision, it misstates the record a bit. In its decision, found at page 3, in the very short paragraph regarding this case, the Court states that the petitioner had received anonymous threats via mail in 1989 and 1990, purportedly from guerrillas. In fact, if the Court would look at the testimony, the threats were in the form of a written note placed under the door of the mother's home, asking the mother to tell the son not to continue with his civil patrol activity. So, to me, there's quite a bit of difference between receiving a letter through the mail than receiving a note under the door in a village in Guatemala during the height of their civil war. And as an additional point, the mother was approached by the leaders of this village, asking that her son, the petitioner, be permitted to join the civil patrol. All three of the communications received by the mother were received via notes under the door. To me, that is closer to a confrontation when the fact of the matter is that the mother and the petitioner lived alone in this residence. The other issue I take with the decision of the Board is it indicates that it agrees with the immigration judge that the uncle's death in that had any relationship to the petitioner. But again, the testimony in this circumstance indicates that the mother of petitioner informed the petitioner that the uncle, who he had resided with for a short period of time, had died by gunshot wound, that the uncle had been a member of the civil patrol in his community, which is a short distance from where petitioner resided, and that she believed that the guerrillas thought that petitioner, in fact, was residing with the uncle. I don't think anything you're arguing is really contrary, is it, to what the Board found? Your Honor, if I may. I mean, you know, I think, as far as I can understand from what you said, what you're arguing is in the record, but I think the Board considered that and they came to the conclusion that these threats weren't seem to go both ways, right? So they chose one path. Does that mean it's not supported by substantial evidence? Your Honor, the distinction here is it seems to me receiving a death threat through the mail is different than receiving notes under your door. It means that the actor who is providing the note, the guerrilla. Well, that's a good argument. That's a good argument, but I don't think our case law compels that, does it? That distinction through the door and in the mail? I guess my point, Your Honor, is, and something I may have neglected in my brief, is to pay a little bit more attention to the mother of the petitioner. Seems the mother of the petitioner has been the conduit through whom the communications from the former son. There's testimony that indicates the mother was quite distraught and upset about this. In fact, she's the one that wanted her son to be in this Civil Guard program. And if I might note, the court last year in Mendoza Pablo indicated that harm suffered by family members has to be a child, a person, when he was actually an infant during the time of the Guatemala Wars, the parents or the mother suffered tremendously. And this court later found that that child who was not cognizant of the events going on around him, in fact, suffered persecution because of what the family suffered. Didn't the board conclude anyway that regardless of all that, that the petitioner's going to lose because of changed country conditions? Yeah, that was actually, is in the second part of the decision of the board, in looking at well-founded fear, they did make that finding. But I would argue, Your Honor, that if there was a finding of past persecution, then there would have had to have been more of an individualized analysis as to whether or not this particular petitioner would suffer harm if he had returned to his country. In addition to that, I did indicate in the brief that there are severe problems going on in that country. And as an alternative to establishing a well-founded fear based on one of the enumerated grounds in the statute, a person can demonstrate other serious harm as an alternative to demonstrate well-founded fear where there has, in fact, been a finding of past persecution first. And so that issue never really came up because the board determined that past persecution, in fact, did not happen. In fact, the IJA, the immigration judge, made the same finding. So I guess in a nutshell, what I'm trying to argue is we need to see the totality of the suffering. The mother suffered. The son saw that. And he, in turn, suffered. And his actions seemed reasonable to me that he promptly left the area, a village in the middle of nowhere, in circumstances where guerrillas certainly could take action against him. Do you know, Counsel, what the status of his son's case is? It's working its way through the system. Yes, Your Honor. His case is still pending before the immigration judge. He has applied for the DACA, the Deferred Action Program of the President for Students. That's pending. We expect adjudication of that within the month or so. So at that point, probably the court would administratively close his case. And that's what we anticipate. And I have nothing further at this point, Your Honor. Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court, I'm Carmel Morgan from the Department of Justice on behalf of the respondent, the U.S. Attorney General. The first time I was here for this court, we did not discuss the merits of the case. So I would like to discuss the merits of the case today. In addressing the petitioner's arguments, it's the government's position that it doesn't make any difference whether the letter came through mail or under the door. That certainly wasn't anything that was argued before the immigration judge or the board, that that was a it seems that indeed, Judge Tashima, under this court's precedent, this case falls under many other cases where unfilled threats just don't amount to pass. And you wanted a fulfilled threat. Is that what he would have had to have? He would have had to proven he was killed? No, no. Well, that's a fulfilled threat. Correct. That is a fulfilled threat. So the difference isn't between unfulfilled and fulfilled, is it? Well, there's many other factors here. It was an anonymous letter. We only deal with unfulfilled threats of death, right? Correct. All right. So we can forget the fact that it was unfulfilled. With regard to a death threat, I think that is accurate, Your Honor. But, you know, it seems to me our death threat cases, it's hard for me to make sense of them. They seem to go both ways, don't they? I mean, some death threat cases where they say it's enough and some cases where we say it's not enough. I would agree you're looking at a larger context of things that are happening outside of the death threat itself. Well, how about this case? The threats on one's life within a context of political and social turmoil or violence have long been held sufficient to satisfy a petitioner's burden of showing an group making the threat has the will or the ability to carry it out. Should we apply that rule? I think even applying that rule, he doesn't meet his burden in this case. And again, you're looking at the larger context. I'd like to point out to the court, the petitioner is correct. His mother was the one that was in receipt of these threats. Well, counsel, we have said that death threats alone can constitute past persecution. And we've also said that generally death threats alone without other actions may not be sufficient. So I think what we have to do is to drill down to the facts of the case. And what strikes me about the facts of this case is the specificity of the threats. Counsel has alluded to the fact that this was a relatively small village where the petitioner was participating in civil patrol. What about that, the specific nature of the threat? How much further do you think the threat has to go in order for the petitioner to meet his burden of past persecution in this case? There are a couple of things. I'm not entirely positive that it's appropriate to classify it as a death threat. He implicitly was, apparently. But I don't think the inference is fairly strong, isn't it? The inference, but I don't think the word death was even used. What's peculiar is that the mother in her letter before the court, she submitted a letter in July 2005. And again, this was a consolidated case, but she didn't mention any letters whatsoever. She also didn't mention the death of the uncle. She only made reference to problems that her grandson had had with gangs. So I find that particularly troublesome in this case, that although the immigration judge found his testimony credible, the one implicit death threat that was never... Don't we have to, since he found it credible, don't we have to take his testimony and not what bothers you? You accept his testimony at face value, but that's not the same as saying because he's credible, he meets his burden. Those are really two different issues, Your Honor. Whether you're bothered by the fact that his mother only talked about her grandson doesn't really matter much if what we have to look at is his testimony and take that at face value. No, I think it does matter. What, that you're bothered? No, no, not that I'm personally bothered, but that it's the petitioner's burden of proof to establish his eligibility for asylum. And here we have only credible testimony, but there's nothing else supporting that. Credible testimony alone isn't enough in every case. It's not necessarily sufficient. Is that what the board said? Not in this case. They didn't explicitly state that, Your Honor. That's not the reason they reached their conclusion. They reached it on a legal theory that this wasn't sufficient. Not that if he had more support for what he said it would be sufficient. Correct. But that it's not sufficient. So I think we don't have to be concerned about corroboration. Well, again... That's not what they said. They didn't say there's no corroboration. So we're bound to as to why they might have found it insufficient. I'm not going to say otherwise. Okay. Now, what about our latest case, which says being forced to flee from one's home in the face of an immediate threat of severe physical violence or death is squarely encompassed in the rubric of persecution? That's our latest statement. And you think he doesn't fall within that? I think he doesn't meet his burden. Yes, Your Honor. Well, that's not answering the question. You say he doesn't meet his burden. I asked whether you thought if this were the law, and it's our latest statement, would you say he doesn't fall within that, taking everything he says is true? I think that is my position, Your Honor. Yes. Okay. There is, counsel, an inexplicable delay in adjudicating his petition in this particular case. I know the government referenced in its brief that it's not clear why. Do you have any information to add to that statement as to why it took so long? One, he did request parole at one point to return to Guatemala. Again, that's sort of another factor. He wasn't harmed in 1993 when he went home for two or three months. But again, I suppose that goes more to well-founded fear. But the court, I mean, the immigration judge and the board just weren't terribly concerned as he made a trip home and seemed to survive just fine. So perhaps him having taken parole delayed his case somewhat. He also counseled... But that can't explain a 14-year delay. I'm just giving you some additional factors. There was also in 2004, I believe, he canceled an asylum interview. I don't know why. But that was another factor in the delay. I also think, but was not around at this time in my present position, but I think many cases were delayed at that time period just because they were inundated with applications from applicants at that time from Guatemala. When you say they, exactly what agency are you talking about? I suppose if you were filing an asylum application, it would have been before the USCIS. Or the predecessors of USCIS. Yes, correct. Let me ask you about this question. It seems to me both sides here seem to regard past persecution... If you win on past persecution, is that the end of the case? No. All right. And then let me ask you, then if you lose on past persecution, are there other barriers to granting relief to the petitioner here? Answer those two questions for me. I misunderstood and probably misspoke with regard to your first question. There's two prongs, past persecution and a well-founded fear of persecution. Right. The government's position is that he's met neither. We don't necessarily win on the past persecution ground because he could still potentially have a well-founded fear of persecution. But it's pretty clear the Civil War had ended in 1996. Is that where the changed country conditions comes in on the well-founded fear? That's correct, Your Honor. Go ahead. All right. So with regard to well-founded fear, given the fact that such a lengthy period of time had elapsed, there had been no further threats and he returned to his home country without harm. All of that goes toward showing that the conditions had fundamentally changed such that he was not unsafe to return to his home country. Now, suppose we conclude that the petitioner should win on the past persecution issue, all right? Is that the end of the case? I think not here because you still have the issue of fundamentally changed country conditions. Well, but that would be the government's burden to rebut the presumption and the IJ never reached that analysis, correct? The IJ never reached that analysis of placing the burden on the government to rebut the presumption? The board certainly reached the issue. I'd have to review the immigration judge's decision to check and see if the immigration judge didn't reach it. Where did the board reach the decision saying we afford a presumption to the petitioner and this rebuts the presumption? Okay, they didn't state that in their decision. They talk about the fundamental change of country conditions. But they don't say whether that rebuts the presumption. They did not explicitly state that, Your Honor. You are correct. Well, because they found no past persecution, so they didn't give him the presumption. In which case, it's not appropriate for us to reach that issue in the first instance, correct? That's correct, Your Honor. So if we were to find that he has sufficiently demonstrated past persecution, we'd have to take another look? Yes, exactly. That's the government's position. You would not be able to reach that in the first instance. And it would have to go back for an evaluation of whether the government had met its burden in that context. Okay. Thank you. If there are no further questions, we ask that you deny the petition for review. Thank you. If I may, I think I can clarify the main reason for the delay in adjudicating the application. There was litigation in the early 1990s, one of which was the American Baptist cases, in which basically all Salvadoran and Guatemalan cases filed in those days in the early 90s and late 80s were held in abeyance for a period of time while that litigation worked its way through the system. Then the asylum offices were directed, beginning in 1995, to have a new system where all new applications would be adjudicated basically within a 60-day period of filing. All the old cases, including this petitioner's cases, fell into the old system. And then ultimately, when NACARA was passed by Congress, beginning in 2005 or 2004, I'm not sure which year, the asylum offices throughout the country began to have interviews on all these old cases. So that's kind of the main reason for the delay in adjudicating this case. Beyond that, your honors, I just would ask the court to consider that this is a case for past persecution and that, contrary to what the board says, this is more than just some threats. The court needs to consider the context of how this happened, and we would ask that the court remand this case for further proceedings so that the immigration court can look at the issue of whether or not the government has met its burden regarding changed country conditions and afford the judge an opportunity to do an individualized analysis as required. With that, I will submit the case, your honor. May I ask you one thing? Certainly, your honor. Just out of curiosity, I don't think it has any effect. I heard that he, from opposing counsel, that he did go back for two or three months. Was there a reason for that? Yes, the mother was very ill. That's what the reason usually is. Yes, and he went back for a very short period of time in 93 and then returned with the parole. Otherwise, his application would have been barred. The other comment I would make, I think the court alluded to this, is that the letter of Petitioner's mother in reference to the Sons case, Frody's case, dealt with the Sons case only. The uncle had been, for example, killed in 1991 and the events before us today all occurred in 89 and 90. The Sons case, Frody, the events for him all occurred in 2003 and 2004. So the focus of the grandmother's letter was regarding Frody only. Thank you. Thank you, your honor. Thank you both very much. Court will stand in recess for the day. All rise.
judges: Reinhardt, Tashima, Nguyen